**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SILVER STATE LAND, LLC,<br><br>            Plaintiff,<br><br>         v.<br><br>JANICE M. SCHNEIDER, in her official capacity as Assistant Secretary of Land and Minerals Management, U.S. Department of the Interior, *et al.*,<br><br>            Defendants. | Civil Action No. 13-cv-00717 (BAH)<br><br>Judge Beryl A. Howell |

<u>**MEMORANDUM OPINION**</u>

After the plaintiff, Silver State Land, LLC ("SSL" or "plaintiff"), invested millions of dollars in developing plans for, and successfully bidding and paying the purchase price to obtain the patent on, approximately 480 acres of federal land located in the City of Henderson, Nevada, LLC, the former Acting Assistant Secretary of Land and Minerals Management ("LMM") in the U.S. Department of the Interior ("DOI"), in accordance with the recommendation of the former Principal Deputy Director of DOI's Bureau of Land Management ("BLM") (collectively "the agency"), decided to cancel the patent issuance process, withhold the patent and terminate the land sale. The plaintiff filed this lawsuit to challenge this agency action, claiming that "the decision to withdraw the sale was contrary to statutory limitations regarding the ability to withdraw the sale, and was arbitrary and capricious," in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1) and (2). Pl.'s Mot. Summ. J. ("Pl.'s Mot."), at 1, ECF No. 32; Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem."), at 9, ECF No. 32. Pending before the Court are the plaintiff's motion for summary judgment to set aside the LMM determination and order immediate delivery of the land patent to the plaintiff, Pl.'s Mot. at 1, and the agency's

cross-motion for summary judgment, Defs.' Cross-Mot. Summ. J. (Defs.' Mot."), at 1, ECF No. 33.[1]  For the reasons set forth below, the agency's motion is granted and the plaintiff's motion is denied.

## I.   BACKGROUND

The factual background of the instant dispute was generally summarized in the Court's prior decision denying the plaintiff's motion to supplement the administrative record, grant extra-record review, or take judicial notice of an Order issued by a Nevada state court, *see Silver State Land, LLC v. Beaudreau*, 59 F. Supp. 3d 158, 161–63 (D.D.C. 2014), and will be reviewed with additional pertinent detail again here.  The genesis of this public land dispute was an ambitious agreement, in early September 2011, between the City of Henderson, Nevada ("Henderson" or "the City") and the Las Vegas National Sports Center LLC ("LVNSC"), for the purchase and development of an approximately 480-acre parcel of public land (the "Property") under the administration of BLM.  Admin. Record ("AR") 1590, 1592, ECF No. 25.[2]  This Property had been identified "within the disposal boundary as set forth in the [Southern Nevada Public Land Management Act of 1998] SNPLMA," AR 1598, which authorized a land disposal program for Southern Nevada, AR 1634.  Under the SNPLMA process, BLM worked with local governments and the State Regional Planning Coalition, "to jointly identify land for public purposes . . . [and] for privatization that supports the achievement of local and regional land-use plans," while ensuring fair market return for the American public from all SNPLMA land sales"

---

[1]      A duplicate of the agency's memorandum in support of its cross-motion for summary judgment is filed as the agency's opposition to the plaintiff's motion for summary judgment.  *Compare* Defs.' Mem. Supp. Cross-Mot. Summ. J. ("Defs.' Mem."), ECF No. 33, *with* Defs.' Opp'n Pl.'s Mot. Summ. J. ("Defs.' Opp'n"), ECF No. 34.  For ease, the Court cites only to the agency's memorandum in support of its cross-motion for summary judgment ("Defs.' Mem.").

[2]      The administrative record was timely lodged with the Court on November 5, 2013, ECF No. 25, along with a privilege log, and is comprised of almost 1800 pages.  Each page of the AR is bate-stamped with numbers bearing the prefix "SSL," which prefix is removed for the sake of brevity in references to the AR here.

and "supporting well-planned communities and commercial development in the Las Vegas Valley." AR 1582.

The agreement between the City and LVNSC, titled "Master Project Agreement" ("MPA"), provided that LVNSC, or its affiliates, would develop, construct and operate "four state-of-the-art sporting event venues," along with mixed-use retail, residential and entertainment facilities, on the Property. AR 1589–1601.[3]  While the plaintiff is not mentioned in the MPA, the term "affiliates" is defined as those entities "directly or indirectly controlling, controlled by, or under common control with" LVNSC, which the agreement indicated was wholly owned by "LVNSC (Holding) LLC." AR 1591, 1609 (MPA § 1.1 and Ex. "C").  LVNSC had the right to assign to its affiliates all or a portion of its rights, interests, responsibilities and obligations under the agreement, upon notice of the assignment to the City.  AR 1592, 1603 (MPA §§ 1.2, 7.9).

The MPA provided clear and obvious benefits to the City.  Specifically, LVNSC agreed to develop and construct the project, in consultation with the City, which would, with some limitation on use, "jointly own all of the Project architectural drawings, renderings, designs, plans and specifications." AR 1592 (MPA § 1.3).  The City also had the right to participate in designing the project and veto changes to any element of the project that would result in elimination of any of the planned venues or noncompliance with certain agreed upon standards. AR 1593 (MPA § 1.7(b)).  In addition, upon completion of the construction of each planned venue, LVNSC was required to "transfer ownership of the applicable venue, together with the portion of the Property upon which such Venue is situated, . . . to the City," AR 1598–99 (MPA

---

[3]     The Master Project Agreement is undated, except for a notation in the footer of the document reflecting the file name notation "Master Project Agreement Final 090111 (2) DOC." AR 1590.  This agreement was "amended and restated" on October 18, 2011. AR 1488–1523; 1470–1487.

§ 3.4), which would own the venue "for public purposes," AR 1592 (MPA § 1.3). [4]  The MPA

required the City to "lease back" the transferred venue to LVNSC.  AR 1599 (MPA § 3.4).

Given the anticipated economic benefits to be derived from the project with LVNSC, the City

agreed to use its bonding and taxing authority to pay for a portion of the costs of developing the

Property, AR 1590, 1596 (MPA Recitals F & G, § 2.2), and to nominate the Property for

disposition through direct sale by BLM to LVNSC, AR 1590, 1598 (MPA Recital C, §§ 3.1,

3.3).  The MPA was "not intended in any respect to be a development agreement," AR 1605

(MPA § 7.19), but the parties agreed to negotiate "a form of development agreement," subject to

approval by the City, to be "entered into by the City and LVNSC following BLM Closing."  AR

1599 (MPA § 4.2).

   In accordance with the MPA and the SNPLMA's "joint selection process," the City

nominated the Property for sale to LVNSC under BLM's "Direct Sale Process as set forth in 43

CFR 2711.3-3."  AR 15 (Letter, dated Sept. 7, 2011, from City's Mayor to BLM).  The City

explained the reasons for its request for a noncompetitive direct sale as follows: "a competitive

sale is not appropriate and the public interest would be best served by a direct sale" because the

property subject to the sale "is an integral part of a project of public importance and speculative

bidding would jeopardize a timely completion and economic viability of the project."  *Id*.  The

City stressed that the project would (1) result in the creation of "approximately 10,000

immediate construction jobs on site, and permanent service and management jobs that will

provide employment for an estimated 4,000 employees;" (2) "provide 'meaningful economic

diversification';" (3) advance "Henderson's planning objectives for the area;" and (4) "stabilize

---

[4]     Plans for the initial phase for the Las Vegas National Sports Complex included four venues: "a 25,000-seat stadium, an 18,000-seat arena, 9,600-seat tennis facilities with a soccer academy, and a 2,000-seat aquatics center." AR 1561; *see also* AR 1590 (MPA Recital E).

and enhance land values and promote future development opportunities on other private and public land in the vicinity." *Id*. at 15–16.  In sum, the City urged the direct sale process to "ensure prompt fair market value and [] support vital public objectives consistent with Henderson's regional land-use plan."  AR 17.

After "careful review" of the City's request and the LVNSC proposal, BLM concluded that a noncompetitive direct sale of the Property to LVNSC was not appropriate since the proposal "does not rise to the level of a 'public project'" as contemplated by the direct sale regulations.  AR 19 (Letter, dated Oct. 4, 2011, from BLM to City's Mayor).  Nonetheless, BLM suggested "other sale methods," including "a modified competitive sale," as provided in 43 CFR 2711.3-2(a).  This alternative sale process could be used when necessary "to assure equitable distribution of land among purchasers or to recognize equitable considerations or public policies," and "could incorporate flexibility through appropriate procedures . . . ." *Id*. at 20. Notably, "a statement indicating the purpose or objective of the bidding procedure would be specified in the notice of realty action." *Id*.  The City agreed to this modified competitive sale process, and designation of LVNSC as the preferential bidder, in order to "support vital public objectives while maintaining consistency with Henderson's regional land-use plan."  AR 1524 (Letter, dated Oct. 10, 2011, from City's Manager to BLM).  The City subsequently advised BLM of a "minor change," requesting that the plaintiff, "a controlled affiliate of the LVNSC," be the designated bidder for the Property.  AR 1209–11 (Letter, dated Jan. 12, 2012, from City's Manager to BLM).  Both LVNSC and the plaintiff are wholly owned by Las Vegas National Sports Center (Holding) LLC.  AR 1211.

On April 4, 2012, BLM published in the Federal Register a Notice of Realty Action ("NORA") for a modified competitive, sealed-bid sale process in which the plaintiff, as the

designated bidder, would be offered the right to meet the highest bid for the Property.  AR 10–13 (77 Fed. Reg. 20413-16).  The Notice explained that the plaintiff was the designated bidder because it had "developed an agreement" with the City "for long-term public benefits to the City and local residents," namely, "to develop the property for public recreation and commercial uses approved by the City."  AR 11.  The plaintiff's failure or refusal to meet the highest bid "shall constitute a waiver of the modified competitive bidding procedure for this proposed sale," *id*., and the highest "bidder will be declared the successful bidder in accordance with the regulations at 43 CFR 2711.3-2(c)," *id.*  If no acceptable bids were received, "the parcel may remain available for sale at a future date in accordance with a competitive sale procedures without further notice."  *Id*.  A successful bidder accrued no contractual or other rights against the United States "until BLM officially accepts the offer to purchase and the full bid price is submitted by the 180th day following the sale."  AR 12.  Notably, notwithstanding the potential accrual of rights by the successful bidder, the NORA cautioned that, under 43 CFR 2711.3-1(f), "BLM may accept or reject any or all offers to purchase, or withdraw any parcel of land . . . from sale, if, in the opinion of a BLM authorized officer, consummation of the sale would be inconsistent with any law, or for other reasons as may be provided by applicable law or regulations."  AR 13.

On June 4, 2012, the plaintiff submitted a bid to purchase the land for $10,560,000, which was the appraised value previously determined by BLM under an appraisal prepared by a third party and reviewed and approved by DOI's Office of Valuation Services.  AR 851.[5]  On June 12, 2012, BLM confirmed the plaintiff as the successful bidder, accepted the bid,

---

[5]    The Property was appraised to have a market value, as of December 5, 2011, of $10,560,000, with its "Highest and Best Use," described as "Hold as a speculative investment until the market justifies development of a major project."  AR 1235 (Appraisal Review Report, dated February 23, 2012).  The Appraisal Review Report notes that "because the lands will be sold at a public auction, there is always the possibility that the lands will be sold to an investor that will hold the lands as a speculative investment until a major project is feasible."  AR 1266.

acknowledged the plaintiff's payment on June 4, 2011 of the bid guarantee and twenty percent deposit, and requested final payment of $8,428,000 by December 3, 2012.  AR 847.

During the Summer and Fall of 2012, the record contains emails indicating that the plaintiff was "having some difficulty coming up with financial backing on this project."  AR 764 (Internal BLM email, dated Sept. 27, 2012).  Although plaintiff's representative communicated to BLM in an email that the final balance due would be deposited by November 20, 2012, AR 744 (Email, dated Nov. 15, 2012, from Mike Ford to BLM), the payment was not received until November 28, 2012, when the plaintiff deposited into an escrow the amount of $8,428,000.  AR 599, 617, 694, 692.  According to the plaintiff, this payment triggered BLM's obligation to issue a patent giving the plaintiff the title to the Property within 30 days.  Compl. ¶¶ 13-14.

In the evening of the same day that the plaintiff paid the balance owed on the Property into escrow, the plaintiff's affiliated company, LVNSC, terminated the MPA with the City.  AR 650–51 (BLM Internal Working Document, dated November 30, 2012, noting that "hours after tendering the balance of the purchase price for the parcel, [plaintiff] provided written notice to the City of Henderson that the project development was no longer viable and stated they were terminating their agreement with the City.").  According to LVNSC's hand-delivered letter to the City, LVNSC exercised the authority under MPA §3.2 to terminate the agreement "[b]ecause the overall project is not viable as contemplated by the MPA."  AR 29 (Letter, dated Nov. 28, 2012, from LVNSC to City).  Notwithstanding the termination, LVNSC indicated it was "fully committed to achieving development of the arena complex and accompanying development in a way that will greatly enhance the City and surrounding areas."  *Id.*

The City's response to LVNSC's termination of the MPA was swift.  Early the next morning, on November 29, 2012, in an email to BLM, the City's attorney requested that BLM

7

"immediately withdraw" the Property nominated for plaintiff pursuant to 43 CFR 2711.3-1, because at a meeting the previous evening, the plaintiff "informed the City that they were backing out of their agreement with the City that would obligate them to build an arena on the property, which was the state[d] [sic] purpose of the Notice of Realty Action." AR 690 (Email, dated Nov. 29, 2012, from the City to BLM).  Believing that the plaintiff "fraudulently induced the City and the federal government to sell [the] [sic] land with the intention of not meeting the stated obligations of the nominated buyer for the modified direct sale," the City requested that "BLM does not grant the patent for the 480 acres to [plaintiff]."  *Id.*

The City's attorney followed-up his email with a letter to BLM, reiterating the request "that BLM refuse to accept the funds deposited by [Christopher] Milam's entities into escrow and that BLM refrain from further processing or issuing a land patent conveying the Property to SSL." AR 28 (Letter, dated Nov. 29, 2012, from the City to BLM).[6]  The City further requested "that BLM immediately issue a letter to SSL and the City confirming that it will not proceed with processing and the issuance of the land patents to SSL until such time as the foregoing issues are resolved."  *Id.*  As support for these requests, the City pointed out the discrepancy in LVNSC's letter citing lack of viability for the project as the reason for the termination, at the same time stating an intention to proceed with the project, "which clearly demonstrates that the project is viable . . . ." AR 27.  More significantly, the City noted that the "sale of the Property was expressly premised upon the existence of the Agreement" and the commitment to develop the Project for public recreation and commercial uses."  *Id.*  These intended uses, as set out in the NORA, "restricted the use of the property" and "limited the potential pool of interested bidders," thereby stifling "potential competition for BLM sale of this

---

[6]     Christopher Milam is the CEO of SSL, Pl.'s Mem. at 9, and a member of LVNSC, AR 29.

land." *Id*.  "[I]n direct contravention of the terms and conditions" of the MPA "and the premises upon which BLM authorized the sale of the Property," however, the plaintiff's affiliates had circulated marketing materials to develop the Property for residential uses.  *Id*. [7]

The escrow instructions provided that BLM had 30 days, until December 28, 2012, to issue the patent after the plaintiff released the sale funds to the title company. AR 302, 308, 638, 641, 803. As of December 5, 2012, BLM understood that the "City does not believe it is in the public interest to issue the patent to [the plaintiff], as the contract between the City and [the plaintiff] is no longer in effect." *Id*.

In order to facilitate its discussions with the City, on December 20, 2012, the plaintiff agreed to an escrow extension of 40 days until February 6, 2013.  AR 301, 304, 523, 584.  The plaintiff agreed to a second escrow extension until March 28, 2013, after the City filed suit, on January 28, 2013, in Nevada state court against the plaintiff "alleging fraud related claims and contract claims."  AR 295, 301, 530–564.  BLM was aware of the lawsuit and briefing on the City's motion for preliminary injunction in that case.  AR 302, 311–434, 435, 437–517.

In March 2013, the plaintiff and the City apparently settled that state court litigation without any admission on either side regarding liability.  AR 202 (Settlement Agreement). [8] Under the terms of the settlement, the City agreed to withdraw any objection it lodged with BLM regarding the issuance of the patent, AR 200, and the plaintiff agreed to have its lenders pay the City $250,000 immediately and another $4,250,000 upon the plaintiff's receipt of the land

---

[7]     The plaintiff discounts the impact of its termination of the MPA, noting that "[b]oth Henderson and LVNSC had reciprocal and unilateral rights to terminate the Development Agreement if either party believed the terms of the Development Agreement made the project non-viable," Compl. ¶ 15, ECF No. 2, and that the City continued to control potential uses of the Property through zoning regulation, *id*. ("[t]he termination of the Development Agreement affected the potential issuance by Henderson of revenue bonds for the project but it did not affect the zoning of the Land . . . [which] remains . . . zoned to be used for the development of a mixed use project with sports venues and that designation cannot be changed by any party other than Henderson").

[8]     The Settlement Agreement contained in the AR is not fully executed by all parties, but the parties refer to it as the final agreement. AR 197–214; Pl.'s Mem. at 9; Defs.' Mem. at 5.

patent, AR 198.  Milam, the CEO of SSL, and any entity which he owns, controls or has an interest in, are prohibited from engaging in any business or development activities within the City, including any business or development activities relating to the Property, except for the limited purpose of "effect[ing] the purchase, financing and ultimate sale of any part, or all, of the [Property]."  AR 200; *see also* Pl.'s Mem. at 9 (conceding that "[a]s a condition of the settlement, Christopher Milam, CEO of SSL, also agreed that he would not seek to or engage in any business activities in Henderson.").[9]  No agreement or plan for the Property is referenced in the settlement. *See generally* AR 197-214.  The City subsequently advised BLM that it "has withdrawn its opposition stated in its November 29th letter to BLM to the issuance of a patent to [the plaintiff] to the Property pursuant to the April 4, 2012 Notice of Realty Action," and did not oppose the transfer of the patent on or before May 13, 2013.  AR 131–32 (Letter, dated April 5, 2013 from City to BLM).  In view of these developments, the plaintiff agreed to a third extension of the closing with BLM until May 13, 2013.  AR 3.

On May 10, 2013, three days before the scheduled date for the issuance of the patent, BLM submitted an almost 130-page "Recommendation Memorandum for the Assistant Secretary" of LLM regarding "Termination of Patent Issuance to [the Plaintiff] for Land Nominated for Sale by the City of Henderson, Nevada for Arena Development Project." AR 3–130 (hereinafter "Recommendation Mem.").  The same day, upon consideration of this Recommendation Memorandum, Tommy Beaudreau, LLM's then-Acting Assistant Secretary, issued a final Decision Memorandum approving BLM's recommendation to assert jurisdiction

---

[9]       The plaintiff claims to have continuing plans to develop the Property, *see* Pl.'s Reply at 16, despite this clear term of the settlement agreement barring Milam's involvement in engaging in any business in the City or doing anything other than selling the Property. The parties have not addressed the impact of this bar on what would happen to the Property should the plaintiff prevail in this action and obtain the patent to the Property, since Milam remains identified as the plaintiff's CEO in the plaintiff's papers.  *See* Pl.'s Mem. at 9.

over the matter and directing BLM to: "(i) not issue the patent to [the plaintiff], (ii) terminate the sale process, and (iii) take the steps necessary to return the purchase deposit and bid guarantee to [the plaintiff], as expeditiously as practicable."  AR 133, 138.

BLM immediately advised the plaintiff the same day that the Acting Assistant Secretary for LMM directed BLM to: "(i) not issue the patent to [the plaintiff], (ii) terminate the sale process, and (iii) take the steps necessary to return the purchase deposit and bid guarantee to [the plaintiff], as expeditiously as practicable."  AR 134 (Letter, dated May 10, 2013, from BLM to plaintiff "Re: Termination of Patent Issuance to [Plaintiff] for the 480 acres Nominated for Sale by the City of Henderson, Nevada for Arena Development Project").  BLM explained that "the sports arena development agreement between the City of Henderson" and plaintiff "served as the basis for BLM's decision to utilize a modified competitive sales process for this parcel, as opposed to the competitive sales process" under the FLPMA.  *Id.*[10]   In light of the "the serious questions that arose subsequent to BLM's acceptance of [plaintiff's] purchase offer regarding the validity and veracity" of that agreement, "this basis for a modified competitive sale process no longer exists, and there remain unresolved questions about the underlying transaction."  *Id.* Consequently, consistent with these directions, BLM did not deliver the patent to the plaintiff and terminated the purchase process for the Property by refunding the bid guarantee deposit and twenty percent deposit to plaintiff.  AR 1.

Less than a week after BLM notified the plaintiff that the patent on the Property would not be issued, the plaintiff, on May 15, 2013, filed the instant complaint requesting the Court to

---

[10]     The plaintiff criticizes the agency for referring to the MPA as a "development agreement," *see* Pl.'s Mem. at 22, n.8 ("BLM consistently uses the wrong terminology when it refers to the [Master Project] Agreement as 'development agreement'") (alteration in the original), but even the plaintiff appears to use these terms interchangeably, *see, e.g.,* Compl. ¶ 38 ("Moreover, no such claims were made against Silver State by anyone, including Henderson, the BLM, the Department of the Interior, some other interested purchaser, or otherwise until *the termination of the Development Agreement* nearly half a year after the auction.") (emphasis added).

declare the LMM decision unlawful, to set it aside, and to order the BLM to issue the patent to

the plaintiff, as well as to enjoin the BLM from reoffering the Property for sale.  *See* Compl.

PRAYER FOR RELIEF.  After the AR had been compiled and lodged, the plaintiff filed a

motion to compel supplementation of the AR, or in the alternative, to allow extra-record review

or judicial notice of the Nevada District Court's March 7, 2013 Order dismissing without

prejudice the City's fraud claims against the plaintiff.  Pl.'s Mot. Suppl. AR, ECF No. 26.  The

Court denied the motion on July 24, 2014 because the plaintiff had "failed to meet its burden of

overcoming the strong presumption that the agency accurately designated the Administrative

Record."  *Silver State Land, LLC*, 59 F. Supp. 3d at 172.  Currently pending before the Court are

the plaintiff's motion for summary judgment and the agency's cross-motion for summary

judgment.  *See* Pl.'s Mot.; Defs.' Mot.

## II.    LEGAL STANDARDS

### A. Summary Judgment Standard Under Federal Rule of Civil Procedure 56

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when

the Court finds, based upon the pleadings, depositions, affidavits, and other factual materials in

the record, "that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(a), (c); see *Tolan v. Cotton*, 134 S. Ct. 1861,

1866, 188 L. Ed. 2d 895 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986).  "A genuine issue of material fact exists if the evidence, 'viewed in a light most

favorable to the nonmoving party,' could support a reasonable jury's verdict for the non-moving

party."  *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013) (quoting

*McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006)).

In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases).  Thus, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting, in an APA case, that "determining the facts is generally the agency's responsibility, not ours"); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) ("Under the APA . . . the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." (quotation marks and citation omitted)). Judicial review is limited to the administrative record, since "[i]t is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal citations and quotation marks omitted; alteration in original); *see* 5 U.S.C. § 706 ("[T]he Court shall review the whole record or those parts of it cited by a party . . . ."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (noting when applying arbitrary and capricious standard under the APA, "'[t]he focal point for judicial review should be the administrative record already in existence . . . .'" (quoting *Camp v. Pitts*, 411 U.S. 138 (1973))).

### B. Standard of Review Under Administrative Procedure Act

The APA authorizes a reviewing court to set aside a challenged agency action "only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"

*Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015) (citing 5 U.S.C. § 706(2)(A)) (other

internal quotations and citation omitted).  The scope of review under the "arbitrary and

capricious standard is 'highly deferential,'" *id*.; *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier

Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir. 2013) (same), and "narrow," such that a court is not

to substitute its judgment for that of the agency," *Judulang v. Holder*, 132 S. Ct. 476, 483

(2011); *see also Fogo de Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127,

1135 (D.C. Cir. 2014) (same); *Agape Church, Inc. v. FCC*, 738 F.3d 397, 408 (D.C. Cir. 2013)

(same).  Yet, "courts retain a role, and an important one, in ensuring that agencies have engaged

in reasoned decisionmaking," *Judulang*, 132 S. Ct. at 483–484, which is the "touchstone of

arbitrary and capricious review," *Pharm. Research & Mfrs. Of Am. v. FTC*, 790 F. 3d 198, 209

(D.C. Cir. 2015) (internal quotations and citation omitted).  Simply put, "the agency must

explain why it decided to act as it did." *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir.

2010).

The D.C. Circuit has recently summarized the circumstances under which an agency

action would normally be "arbitrary and capricious" to include "if the agency has relied on

factors which Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise." *Pharm. Research & Mfrs. Of Am. v. FTC*, 790 F. 3d at 209.  Thus,

when an agency "'fail[s] to provide a reasoned explanation, or where the record belies the

agency's conclusion, [the court] must undo its action.'" *Cnty. of Los Angeles v. Shalala*, 192

F.3d 1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C.

Cir. 1999)); *see Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C.

Cir. 2014) (noting that when "'an agency's failure to state its reasoning or to adopt an intelligible decisional standard is [] glaring [] we can declare with confidence that the agency action was arbitrary and capricious'" (quoting *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994)));

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (internal quotation marks and citation omitted)). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning.*" *Amerijet Int'l Inc.*, 753 F.3d at 1350 (internal quotation marks omitted; emphasis in the original).

When, as here, review of an agency's action is "bound up with a record-based factual conclusion," the reviewing court must determine whether that conclusion "is supported by substantial evidence." *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999) (internal quotation marks omitted); *see also Kappos v. Hyatt*, 132 S. Ct. 1690, 1695 (2012) (affirming review of "factual findings under the APA's deferential 'substantial evidence' standard"); *Kaufman v. Perez*, 745 F.3d 521, 527 (D.C. Cir. 2014) (noting that agency factual findings may be "set aside . . . 'only if unsupported by substantial evidence on the record as a whole'") (quoting *Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176 (D.C. Cir. 2007)); *Dillmon v. NTSB*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (noting that agency's factual findings may be adopted "as conclusive if supported by substantial evidence . . . even though a plausible alternative interpretation of the evidence would support a contrary view" (internal quotation marks omitted)).  In reaching its conclusion, the agency must have reviewed relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *Zevallos*, 793 F.3d at 112 (internal quotations and citations omitted).  Notably, "an agency's

refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706," as does ignoring "evidence contradicting its position." *Butte Cnty.*, 613 F.3d at 194.  The reason an agency decision "would be arbitrary and capricious" if it is not "supported by substantial evidence" is because "'it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense.'"  *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007) (quoting *Ass'n of Data Processing Serv. Organizations, Inc. v Bd. of Governors of Fed. Reserve Sys. ("ADPSO")*, 745 F.2d 677, 684 (D.C. Cir. 1984)).  Consequently, when assessing whether agency action is arbitrary or capricious, "in their application to the requirement of factual support[,] the substantial evidence test and the arbitrary or capricious test are one and the same."  *ADPSO*, 745 F.2d at 683; *accord CTS Corp.*, 759 F.3d at 59 n.1.

## III.    DISCUSSION

The plaintiff challenges the LMM decision not to issue the patent for the Property to the plaintiff and to terminate the sale process on three principle grounds: (1) the agency lacked authority to terminate the sale, Pl.'s Mem. at 13; (2) the agency's decision was arbitrary and capricious, *id.* at 20; and (3) the agency violated the plaintiff's due process rights by terminating the sale without providing the plaintiff an "opportunity or reason to submit additional information, *id.* at 29.  For the reasons detailed below, the Court concludes that the agency interpreted applicable statutory provisions and its own regulations reasonably to provide authority to terminate the sale and, consequently, the challenged decision was not arbitrary and capricious but supported by substantial evidence, and that the plaintiff's due process rights were not violated.  Consequently, the challenged decision must be upheld.

16

### A.   The Agency Is Authorized to Terminate Sale of Public Land When Consummation Would be Contrary to Law

The agency contends that it has plenary authority to terminate sales where consummation would be contrary to law.  Def.'s Mem. at 8–9.  Citing both provisions of the FLPMA and agency regulations, the plaintiff counters that the agency had no authority to refuse to issue the patent eleven months after accepting the plaintiff's offer.  The plaintiff argues, first, that "§ 203 of the FLPMA," codified at 43 U.S.C. § 1713, "strictly constrains the authority to withdraw a sale of public land . . . within 30 days of receipt of an offer," Pl.'s Mem. at 13; second, under § 208 of the FLPMA, 43 U.S.C. § 1718, the agency had a "ministerial duty to deliver the patent" once the plaintiff's offer was accepted, *id.* at 18; and, third, § 204(a) of the FLPMA, 43 U.S.C. § 1714(a) "limits the officials who can withdraw land from sale to 'individuals in the Office of the Secretary who have been appointed by the President, by and with the advice and consent of the Senate," but Acting Assistant Secretary Beaudreau was neither nominated nor confirmed when he made the decision to withdraw, *id.* at 19.  The Court addresses each of these arguments below.

### 1.   The Secretary Is Authorized to Stop Consummation of Unlawful Sales of Public Lands

The agency argues, and the Court agrees, that the DOI Secretary has authority to terminate the sale of public land, even after acceptance of a purchase offer, where consummation of the sale would be contrary to law.  Defs.' Mem. at 12.  This conclusion is predicated on long-standing principles relating to the general statutory mandate of DOI and its Secretary to manage public lands, consistent with statutory requirements, together with the broad authority generally granted to DOI to carry out this responsibility and, more specifically, to determine the validity of claims to public lands.  The Supreme Court, over a century ago, described the DOI Secretary's role thusly:

The Secretary is the guardian of the people of the United States over the public lands.  The obligations of his oath of office oblige him to see that the law is carried out, and that none of the public domain is wasted or is disposed of to a party not entitled to it.  He represents the government, which is a party in interest in every case involving the surveying and disposal of public lands.

*Knight v. United States Land Association*, 142 U.S. 161, 181 (1891).  Consistent with this responsibility, the *Knight* Court explained that "if, when a patent is about to issue, the Secretary should discover a fatal defect in the proceedings, or that by reason of some newly ascertained fact the patent, if issued, would have to be annulled, . . . it would hardly be seriously contended that the Secretary might not interfere and prevent the execution of the patent." *Id.* at 178.  The Court stressed that "[h]e could not be obliged to sit quietly and allow a proceeding to be consummated, which it would be immediately his duty to ask the attorney general to take measures to annul." *Id.*

The Supreme Court has never wavered from the *Knight* Court's view of the DOI Secretary's authority both to determine the validity of claims to public land and deny issuance of a patent to a claimant whose claim is invalid.[11]  *See, e.g., Best v. Humboldt Placer Min. Co.*, 371 U.S. 334, 336, 356 (1963) (finding that "the District Court acted properly in holding its hand until the issue of the validity of the claims has been resolved by the agency entrusted by Congress with the task," noting that "[t]he determination of the validity of claims against the public lands was entrusted . . . to the Department of the Interior on its creation in 1849.  Since that time, the Department has been granted plenary authority over the administration of public lands . . . .; and it has been given broad authority to issue regulations concerning them" (internal citations omitted)); *Cameron v. United States*, 252 U.S. 450, 460 (1920) ("If valid, [an

---

[11]     A patent generates a deed transferring title to federal government land.  *See Knight*, 142 U.S. at 188 ("'[T]he patent is a deed of the United States.  As a deed its operation is that of a quit-claim, or rather a conveyance of such interest as the United States possessed in the land . . . .'" (quoting *Beard v. Federy*, 70 U.S. 478, 491 (1866)).

unpatented land claim] gives to the claimant certain exclusive possessory rights . . . . But no right arises from an invalid claim of any kind.  All must conform to the law under which they are initiated; otherwise they work an unlawful private appropriation in derogation of the rights of the public."); *Michigan Land & Lumber Co. v. Rust*, 168 U.S. 589, 593, 596 (1897) (noting that "the power of the department to inquire into the extent and validity of the rights claimed against the Government does not cease until the legal title has passed" and finding that "it was within the power of the land department, at any time prior to the issue of a patent, of its own motion, to order a resurvey, and correct by that any mistakes in the prior survey"); *Orchard v. Alexander*, 157 U.S. 372, 381–82 (1895) (concluding that agency properly exercised jurisdiction to examine validity of, and deny issuance of patent, where the entire purchase money for the public land had been paid and a receiver's final certificate issued, but agency found that claim was based on fraudulent statements and therefore invalid (citing and quoting *Knight*, 142 U.S. at 177)).

In accordance with this binding precedent, courts have consistently found that, in the exercise of the DOI Secretary's "plenary authority," the agency may evaluate the validity of a claim to government land at any time up to the actual issuance of the patent since, until title is transferred, DOI remains the legal steward responsible for ensuring that any conveyance of the land is in strict compliance with Congressional mandates.  *See Union Oil Co. of Cal. V. Udall*, 289 F.2d 790, 792 (D.C. Cir. 1961) ("Assuming arguendo that [the plaintiff] acquired equitable title by payment and receipt, it is well established that until legal title has passed to the applicant for a patent, the Secretary may require further inquiry into the validity of claimed rights to public land." (citations omitted)); *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735, 753 (10th Cir. 2005) ("'[I]n the absence of some direction to the contrary,' the general statutory provisions giving the Land Department authority to execute the laws regulating

the public lands also give it authority to inquire into claims against the government under a statutory grant of land.  The Supreme Court made clear, however, that the agency's authority continues only 'so long as the legal title remains in the government.'" (quoting *Cameron*, 252 U.S. at 460–61)); *Schade v. Andrus*, 638 F.2d 122, 124 (9th Cir. 1981) ("[T]he Secretary of the Interior has 'broad plenary power over the disposition of public lands' . . . so long as legal title remains in the government, there is continuing jurisdiction in the Department to consider all issues in land claims" (internal citations omitted)); *Ideal Basic Indus., Inc. v. Morton*, 542 F.2d 1364, 1367–78 (9th Cir. 1976) ("[T]he Secretary of Interior has broad plenary powers over the disposition of public lands.  He has a continuing jurisdiction with respect to these lands until a patent issues, and he is not estopped by the principles of res judicata or finality of administrative action from correcting or reversing an erroneous decision by his subordinates or predecessors in interest."); *Adams v. U.S.*, 318 F.2d 861, n.10 (9th Cir. 1963) (noting that the government has the power to determine if the claim is valid, and if invalid, "to declare it null and void" (quoting *Cameron*, 252 U.S. at 460)).

The plaintiff "acknowledges that the Secretary may have broad powers over the disposition of federal land," Pl.'s Reply in Supp. Pl.'s Mot. for Summ. J. and Opp'n to Defs.' Cross-Mot. for Summ. J. ("Pl.'s Reply") at 7, ECF No. 35, but nonetheless dismisses this long line of cases confirming the plenary powers of the DOI Secretary to withhold issuance of a patent to a claimant whose claim to the land at issue is found to be invalid.  According to the plaintiff, this caselaw "aris[es] from authorities dating well before the passage" of the FLPMA, *id*., "do not address the statute at issue here and do not authorize the Secretary to act contrary to clear and unambiguous statutory constraints on his ability to stop the sale of the Land to [plaintiff]," *id*. at 8.

The plaintiff's strained effort to limit the multiple holdings of Supreme Court and Circuit courts, including the D.C. Circuit, by arguing that those cases addressed the plenary power of the DOI Secretary only under "archaic statutes," *id*. at 8, cannot be squared with the clear language of the cases and the continuing statutory grants of authority to the Secretary.  For example, the *Cameron* Court relied on the "general statutory provisions" as confiding "the execution of the laws regulating the acquisition of rights in the public lands and the general care of these lands . . . to the land department" and tasking "the Secretary of the Interior, as the head of the department . . . with seeing that this authority is rightly exercised to the end that valid claims may be recognized, invalid ones eliminated, and the rights of the public preserved."  *Cameron*, 252 U.S. at 459–60.  Even though "the mineral land law does not in itself confer such authority on the land department," the *Cameron* Court did not hesitate to conclude that, "in the absence of some direction to the contrary, the general statutory provisions before mentioned vest [authority to determine the validity of claims] in the land department."  *Id*. at 461.  Moreover, "the power of the department to inquire into the extent and validity of the rights claimed against the Government does not cease until the legal title has passed."  *Id*.

The "general statutory provisions" referenced by the *Cameron* Court continue to delegate to the Secretary the authority to supervise "public business relating to . . . Bureau of Land Management."  43 U.S.C. § 1457.  BLM has the duty to perform various functions, including those "appertaining to the . . . sale of the public lands of the United States, or in anywise respecting such public lands, and also, such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the government."  43 U.S.C. § 2.  While these general statutory provisions pre-date the FLMPA, which was enacted in 1976, the latter act expressly states that it "shall then be construed as supplemental to and not in derogation of the

purposes for which public lands are administered under other provisions of law," 43 U.S.C. §1701(b), and, further, contains a "savings" clause clarifying that "[n]othing in this [FLMPA] shall be deemed to repeal any existing law by implication," *id*. note, P.L. 94-579, Title VII 701(f), 90 Stat. 2743.

Consequently, the plenary power of the DOI Secretary to determine the lawfulness of the issuance of a patent remains intact, even after passage of the FLMPA, absent a contrary statutory provision.  The plaintiff posits that the agency's decision to terminate the sale *is* contrary to three provisions of the FLPMA, namely, sections 203(g), 208, and 204(a).  Pl.'s Mem. at 18.  The Court next examines each of these FLPMA sections, which the plaintiff contends effectively limit the Secretary's plenary power.

### 2.   FLPMA § 203(g) Does Not Limit Secretary's Authority to Terminate Sales Not in Compliance with Law

The plaintiff argues that Section 203(g) of the FLPMA, codified at 43 U.S.C. § 1713(g), limits the "Secretary's and BLM's authority to withdraw the land from sale . . . to ***thirty days after receipt of the bid offer.***"  Pl.'s Mem. at 13 (emphasis in original).  This subsection, titled "Acceptance or rejection of offers to purchase," states, in pertinent part:

> The Secretary shall accept or reject, in writing, any offer to purchase made through competitive bidding at his invitation no later than thirty days after the receipt of such offer . . . , unless the offeror waives his right to a decision within such thirty-day period. Prior to the expiration of such periods the Secretary may refuse to accept any offer or may withdraw any land or interest in land from sale under this section when he determines that consummation of the sale would not be consistent with this Act or other applicable law.

FLPMA § 203(g), 43 U.S.C. § 1713(g).

The text of § 203(g) addresses only two scenarios: when the Secretary "may refuse to accept an offer" and when he "may withdraw any land" from sale.  The challenged LMM decision falls into neither of these categories.  On the contrary, in this case, the agency had

already accepted an offer from the plaintiff, so it did not "refuse to accept [the] offer."  In

addition, the agency did not "withdraw [the] land" from sale generally.  *See* Defs.' Mem. at 20

(clarifying that the Property "remains available for sale under FLPMA").  Instead, the agency

terminated the sale specifically to the plaintiff because the sale was predicated on a process that

was only lawful under certain conditions meeting the statutory requirements.  When those

conditions evaporated, the process was no longer statutorily permissible and any sale resulting

from that impermissible process was similarly legally deficient.  As the agency explains, the

Secretary decided "not to consummate the sale when the basis for BLM's utilization of special

procedures no longer existed."  *Id.* at 13.  In short, the agency is correct that the plain language

of the statute does not address the Secretary's authority to terminate the sale, where the agency

has already accepted the offer within 30 days, if consummation would be unlawful.  *Id.* at 14.

The plaintiff seeks to avoid the plain language of § 203(g) by pointing to legislative

history in the form of a Senate Report describing an earlier version of this provision considered

in an earlier Congressional session prior to enactment of the FLPMA.  Pl.'s Opp'n at 8 (quoting

S. Rep. 94-538).  Specifically, the Senate Report relied upon by the plaintiff describes the earlier

version of § 203(g) as "authoriz[ing] the Secretary to refuse an offer of purchase until he has

actually accepted the offer.  However, he would be bound to consummate the sale once he has

accepted the offer."  S. REP. NO. 94-583, at 48 (accompanying § 206) (1975).  Consistent with

this summary, the earlier bill language stated, in the first sentence of the proposed section:

"Until the Secretary has accepted an offer to purchase, he may refuse to accept any offer or may

withdraw any land or interest in land from sale under this Act when he determines that

consummation of the sale would not be consistent with this Act or other applicable law."  *Id.* at 5

(§ 206).[12]  The Senate may have intended this language to bind the Secretary to "consummate the sale once he has accepted the offer," because the language of the Senate bill permits the Secretary to refuse an offer or withdraw land only *until* the moment he accepts an offer to purchase, thus marking the moment of acceptance as the key moment when the Secretary's refusal or withdrawal power stops.

The final enacted language, however, is derived verbatim from the House version of the legislation and uses different language, without an emphasis on the moment of acceptance. Instead, the enacted language reads: "The Secretary shall accept or reject, in writing, any offer to purchase made through competitive bidding at his invitation no later than thirty days after receipt of such offer . . . . unless the offeror waives his right to a decision within such thirty-day period. Prior to the expiration of such periods the Secretary may refuse to accept any offer or may withdraw any land or interest in land from sale under this section when he determines that consummation of the sale would not be consistent with this Act or other applicable law."  43 U.S.C. § 1713(g); *see also* H. R. 13777, 94th Cong. § 203(e) (1976). [13]  This enacted language, unlike the earlier Senate version, allows the Secretary to refuse an offer to purchase even after such an offer is accepted, when the refusal is made "prior to the expiration" of thirty days.  The Senate report, which describes the Secretary as "bound to consummate the sale once he has accepted the offer," cannot possibly purport to be an interpretation of this final enacted bill, which, on its face, contradicts the Senate reading.  In fact, the House Report accompanying H.R. 13777 describes the provision as merely establishing the "[p]rocedures and time limitations for

---

[12]     This proposed section contains a second sentence stating: "The Secretary shall accept or reject, in writing, any offer to purchase made through competitive bid at his invitation no later than thirty days after the submission of such offer."  S. Rep. No. 94-583 at 5.  Similar language is used in the first sentence of the final, enacted version of this provision.

[13]     Although § 203(g) allows for the offeror to "waive[] his right to a decision within thirty-day period," no party to this action contends that the plaintiff agreed to such waiver,  Pl.'s Mem. at 14–15, and, in any event, the agency made the decision to accept the plaintiff's offer within thirty days.

rejection or acceptance of offers to purchase," rather than also limiting the Secretary's powers to revoke a sale after such acceptance even when the sale is determined to be violative of the law. H. REP. NO. 94-1163, at 8 (1976).  In short, the Senate Report cited by the plaintiff pertains to different bill language and provides no reliable guidance on the proper interpretation of the enacted version of § 203(g).

Moreover, the plaintiff's proffered interpretation of § 203(g) would lead to the absurd result that the Secretary is compelled to consummate a sale that is contrary to law. Such a statutory interpretation is highly disfavored.  *See United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940) ("When [one possible statutory] meaning has led to absurd or futile results . . . this Court has looked beyond the words to the purpose of the act."); *see also Corley v. U.S.*, 556 U.S. 303, 317 (2009) (interpreting criminal procedure statute to avoid "absurdities of literalism"); *Ctr. for Biological Diversity v. E.P.A.*, 722 F.3d 401, 411 (D.C. Cir. 2013) (recognizing "'the long-standing rule that a statute should not be construed to produce an absurd result'" (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998))).

In a last gasp effort to construe § 203(g) as limiting the Secretary's authority to refuse an offer to purchase to the time period within thirty days after receipt of such offer, the plaintiff contends that allowing the Secretary to terminate sales whenever they are not in compliance with the law would render the clause "no later than thirty days" superfluous.  Pl.'s Reply at 10.  The Court disagrees.  Failure by the agency to comply with the time limits in § 203(g) to "accept or reject" an offer to purchase would provide a basis for an offeror to bring an action to compel the agency to comply with the statutory time limit and, further, upon acceptance of an offer, the agency acknowledges the possibility of "repercussions such as financial liability to the potential

purchaser."  Defs.' Mem. at 13 (citing 43 C.F.R. §2711.3-1(g)). [14]   Thus, the time limits are not superfluous.  At the same time, these time limits do not operate to limit the Secretary's authority to conduct the affairs of the agency in conformity with the law.

Accordingly, the Court concludes that § 203(g) does not limit the agency's authority to terminate the sale where consummation would be unlawful.

### 3.   FLPMA § 208 Does Not Impose a Ministerial Duty on the Secretary to Issue the Patent

The plaintiff next argues that the agency had a "ministerial duty to deliver the patent" once the plaintiff's offer to purchase the Property had been accepted.  Pl.'s Mem. at 18–19.  As support, the plaintiff relies upon § 208 of the FLPMA, which states, in pertinent part, that "[t]he Secretary shall issue all patents or other documents of conveyance after any disposal authorized by this Act."  43 U.S.C. § 1718.  The agency focuses on the last words in this statutory sentence to point out that this section only "governs issuance of patents 'authorized by this Act.'"  Defs.' Mem. at 16.  As applied to the sale at issue in this lawsuit, the agency points out that when "the primary basis for the modified competitive sale process . . . was eliminated," the procedure used to facilitate the sale was no longer appropriate and, therefore, issuance of the patent would not have been a "disposal authorized by this Act."  *Id.*

The Court agrees, as discussed *infra* in Part III.B, that the record in this case provides substantial evidence for the agency's conclusion regarding the inappropriateness of the

---

[14]      The plaintiff's reliance on 43 C.F.R. § 2711.3-1(g) as support for its position is unavailing. This regulation states that "[u]ntil the acceptance of the offer and payment of the purchase price, the bidder has no contractual or other rights against the United States, and no action taken shall create any contractual or other obligations of the United States."  According to the plaintiff, "[t]his language identifies the acceptance of the offer and the payment of the purchase price as the point that [the agency] became bound to deliver the patent." Pl.'s Mem. at 18–19.  The Court disagrees.  This regulation merely delineates when an offeror has *no* contractual rights, and not when contractual rights *do* attach.  Furthermore, to the extent this regulation may confer any contractual right upon an offeror whose offer has been accepted, the regulation is silent as to what those rights may be.  Such silence cannot be construed as conferring on a prospective buyer of public lands the right to compel the agency to deliver the patent, in violation of other provisions of the FLPMA.

procedure used to conduct the sale upon termination by the plaintiff of its agreement with the City.[15]  Consequently, § 208 does not apply to the challenged LMM decision.

This conclusion that § 208 requires the issuance of patents to public lands only when legally authorized, is confirmed by other language in § 208, which directs the Secretary, with certain exceptions, to "insert in any [] patent or other document of conveyance he issues," conditions deemed necessary "to insure proper land use and protection of the public interest."  43 U.S.C. § 1718.  The Secretary is further directed "not [to] make conveyances of public lands" on terms and conditions that would, at the time of conveyance, amount to a violation of "any law or regulation pursuant to State and local land use plans, or programs."  *Id.*  In other words, even if an offer to purchase public land is accepted, no matter the terms of the offer, the Secretary is nonetheless required in any conveyance to impose terms and conditions in conformity with applicable federal, State and local laws.

Accordingly, § 208 does not obligate the agency to deliver the patent even though the offer to purchase had been accepted, when consummation of the sale would be unlawful.

### 4.    FLMPA § 204 Does Not Remove Authority of Acting Assistant Secretary To Terminate An Unlawful Sale

Finally, the plaintiff contends that the Acting Assistant Secretary, who adopted BLM's recommendation to terminate the sale, had no such authority under § 204(a) of the FLPMA, which is titled "Withdrawals of Lands," and provides, in pertinent part, that "the Secretary is authorized to make, modify, extend, or revoke withdrawals but only in accordance with the

---

[15]    While conceding that BLM has discretion whether to initiate the sale process, the plaintiff contends that, under Sections 203(g) and 208, "once BLM accepts or rejects an offer or 30 days pass the Secretary loses discretion to withdraw the land from sale," Pl.'s Reply at 19, citing cases in which the Secretary has been ordered to award leases to the highest lawful bidder, *id.* at 19–20.  Yet, by contrast to the cited cases, the agency is not seeking to withdraw the land from sale; instead, it is seeking to terminate a sale facilitated by a bidding process predicated on an incorrect factual context, rendering both the process and sale unlawful.  *See* Defs.' Mem. at 20.  In other words, whether the Secretary may be compelled to award a lease to the highest lawful bidder of a lawfully utilized competitive bidding process is simply not the issue here.

provisions and limitations of this section.  The Secretary may delegate this withdrawal authority

only to individuals in the Office of the Secretary who have been appointed by the President, by

and with the advice and consent of the Senate."  43 U.S.C. § 1714(a); Pl.'s Mem. at 19.

According to the plaintiff, the Acting Assistant Secretary was only "***acting*** in the capacity of

Assistant Secretary . . . at the time of his decision.  He was neither nominated nor confirmed in

the position."  Pl.'s Mem. at 19 (emphasis in original).

At the outset, the parties dispute whether the plaintiff adequately asserts this challenge to

the lawfulness of the agency action in the complaint.  *See* Defs.' Mem. at 19; Pl.'s Reply at 25–

26.  No claim for relief is asserted that the agency action must be set aside due to the status of the

agency official making the challenged decision.  On the contrary, the complaint references only

briefly that "Acting Assistant Secretary, exercising the BLM's authority by virtue of 43 C.F.R. §

4.5(a)," made the decision "without authority on May 10, 2013," Compl.  ¶ 33.  The "without

authority" referenced in this allegation does not refer to the status of the official making the

challenged decision, however, but to the timeliness of the decision, as confirmed by the caption

for the First Claim for Relief.  *Id*. FIRST CLAIM FOR RELIEF ("The Assistant Secretary's

Authority to Withdraw the Sale Expired Thirty Days After the BLM Accepted the Offer to

Purchase and His Decision is Therefore in Violation of the FLPMA and the APA").  This was

plainly not a claim challenging the authority of the decision-maker due to his status.  Thus, the

plaintiff has failed to plead adequately this legal basis for challenging the agency action.

In any event, even considered on the merits, this claim fails.  The requirement in §

1714(a) of a decision-maker who is a Senate-confirmed Presidential nominee, is irrelevant

because this statutory provision pertains to the withdrawal of parcels of land from sale, not the

termination of land sales.  *See* Defs.' Mem. at 20 (citing AR 8 (Recommendation Mem.)).

Rather than being withdrawn from sale, the Property "remains available for sale under FLPMA in accordance with the process requirements of SNPLMA." *Id.*

The plaintiff discounts this interpretation of § 1714(a) as an "overly technical argument" because there is no difference between "a withdrawal of land from sale" and "a termination of a land sale." Pl.'s Reply at 25.  The plaintiff is incorrect, however.  A termination of a land sale only terminates the sale of public land *as to that particular purchaser*, but the public land is still available for sale.  Withdrawal of public land means withholding Federal land from, *inter alia*, sale "for the purpose of limiting activities … to maintain other public values … or reserving the area for a particular public purpose or program…"  *See* 43 U.S.C. §1702 (j).  Upon withdrawal of land from sale, no party may purchase it.  Section 1714(a) is limited to such withdrawals and, therefore, is inapplicable here.

Accordingly, § 1714(a) does not operate as any bar to the Acting Assistant Secretary making the challenged decision to terminate the sale.

*     *     *

The Court concludes that the FLPMA does not limit the DOI Secretary's plenary power to determine, prior to the issuance of a patent, whether such issuance is lawful and to withhold any patent where conveyance of federal public land would be in contravention of Congressional statutory mandates. [16]

---

[16]    The agency's own regulations reflect the Secretary's authority to review, revise and reverse actions of DOI employees determined to be contrary to the law.  *See, e.g.,* 43 C.F.R. § 4.5 (The Secretary has "the authority to review any decision of any employee or employee of the Department[.]"); 43 C.F.R. § 1810.3(b) ("The United States is not bound or estopped by the acts of its officers or agents when they enter into an arrangement or agreement to do or cause to be done what the law does not sanction or permit.").  The plaintiff contends that the agency's interpretation of these regulations is "contrary to the plain language" of FLPMA provisions, Pl.'s Reply at 9, but, as discussed *supra*, Part III.A.2–4, the Court disagrees and finds instead that the Secretary's power to stop consummation of a sale by refusing to issue a patent when consummation would be unlawful does not come within the ambit of any section of the FLPMA.  Since Congress has not "'directly spoken to the precise question at issue,' and . . . 'the statute is silent . . . with respect to the specific issue,'" the Court only needs to find that the agency's interpretation "'is based on a permissible construction of the statute.'"  *Associated Builders and Contractors, Inc. v.*

**B.    The Agency's Decision to Terminate the Sale Is Supported by Substantial Evidence**

Even if the agency is authorized to terminate an unlawful sale after accepting an offer, the plaintiff contends that the decision to terminate the sale here was arbitrary and capricious because "it failed to consider relevant factors and was contrary to evidence."  Pl.'s Mem. at 20. The basis for giving the plaintiff preferential status in a modified competitive sale process was the MPA entered into by the plaintiff and the City.  The plaintiff, however, canceled that agreement on the evening of the same day the plaintiff deposited into escrow the remaining balance of the final purchase price for the Property to complete the sale.  AR 4–5 (Recommendation Mem.).  Without the MPA in place, the plaintiff would not have received the benefits of a modified competitive sale process, rendering any subsequent sale to this plaintiff unlawful under 43 U.S.C. § 1713(f) and 43 C.F.R. § 2711.3-2(a).  Consequently, the agency decided to terminate the sale to the plaintiff.  AR 7.

The FLPMA favors the use of open competitive bidding for the disposition of public lands.  *See* 43 U.S.C. § 1713(f) ("Competitive bidding requirements. Sales of public lands under this section *shall* be conducted under competitive bidding procedures to be established by the Secretary.") (emphasis added).  Nevertheless, this subsection authorizes the use of a modified competitive bidding process when "the Secretary determines it necessary and proper in order (1) to assure equitable distribution among purchasers of lands, or (2) to recognize equitable considerations or public policies, including but not limited to, a preference to users . . . ."  *Id.* BLM explains that the use of modified competitive bidding to sell the Property was approved, with the plaintiff named as the designated bidder, "based on representations made by Henderson

---

*Shiu*, 773 F.3d 257, 262 (D.C. Cir. 2014) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 567 U.S. 837, 842–43 (1984)).

and [the plaintiff] about an agreement they had entered into." AR 3 (Recommendation Mem.).
Due to the terms of the MPA, the City represented certain public benefits "might not be realized"
if the Property were sold using "a normal competitive sale process" because it would "allow for
speculative bidding and could delay timely development" of the project that the plaintiff agreed
to build, namely, a "professional sports arenas and other recreation facilities," which
development "would foster approximately 10,000 construction jobs, 4,000 service/management
jobs, and contribute to the overall 'economic diversification' of the area by attracting major
events." AR 3–4.

BLM concluded that these enumerated public benefits vanished upon cancellation of the
MPA by the plaintiff later in the same day on which the plaintiff delivered the final payment into
escrow for the Property. AR 5. Indeed, the plaintiff's actions prompted the City immediately to
request that BLM withhold issuance of the patent to the Property and to initiate legal action for
fraudulent misrepresentation against the plaintiff. AR 3.

The plaintiff emphasizes that the City and the plaintiff later reached a settlement
agreement resolving the lawsuit, and that this settlement should have been considered by the
agency before refusing to consummate the sale. Pl.'s Mem. at 21. Yet, the agency did consider
the terms of the settlement agreement and those terms only bolster, rather than undercut, the
challenged decision. *See* AR 5 ("[T]he public benefits [Henderson] wished to promote through
the BLM's use of a modified competitive sale process[] no longer exists as evidenced by the
Settlement Agreement."). First, the settlement agreement conspicuously does not "require [the
plaintiff] or its successors to enter into a new arena development agreement; it simply notes that
the land is currently zoned for such use." AR 6. Second, the construction and operation of the
"professional sports arena" designed to foster "'economic diversification' of the area" and create

31

tens of thousands of jobs, which were the anticipated and cited "public benefits," were no longer guaranteed to materialize.  Third, and more troublingly, BLM notes that the settlement agreement bars the "person who formed [the plaintiff] and promoted the arena projects . . . from engaging in any business within Henderson, Nevada."  AR 6.  This condition in the settlement agreement essentially barred the plaintiff's CEO from conducting any business within the City and made highly questionable whether the plaintiff *could* develop the land, let alone on the same scale with any of the same features that created the "public benefits" persuading the agency to conduct a modified bid process.  Indeed, the plaintiff had apparently already engaged in marketing the Property to investors "for [] residential development," AR 27 (Email, dated Nov. 29, 2012, from the City to BLM), further bolstering BLM's determination that the justifications for utilizing the modified competitive bidding, such as avoiding "speculative bidding" and development delay, were no longer present.

In sum, the agency determination was rational and predicated on substantial evidence that the basis for a modified competitive bidding process no longer existed.  AR 7.  The FLPMA does not authorize use of a modified competitive bidding unless "necessary and proper" to, *inter alia*, recognize public policies and when that prerequisite for the bidding process is not present, the sale is not authorized.  In the circumstances created by the plaintiff's termination of the MPA with the City, if the sale were consummated, the plaintiff would have received the substantial benefit of ownership to formerly public lands at no more than the valuation price, without contractual obligation to use the land in conformity with the anticipated "public benefits" set out in the terminated agreement.

While the plaintiff protests that an open competitive bidding process would not have produced a different result since the plaintiff paid the valuation price for the land and had no

competing bids, this argument misses the point.  *See* Pl.'s Reply at 14 (arguing that "competitive

bidding would have had the same consequences as modified competitive bidding," noting "the

result here would in fact have been the same; there were no competing bidders and SSl would

have won the auction.").  As the agency points out, if an open competitive bidding process had

been used, the plaintiff "would have had an incentive to place a higher bid in the first instance if

it knew it was not going to have an opportunity later to match other bids," plus other "potential

bidder[s] may have been deterred by the special status [the plaintiff] received through the

modified competitive sale process," giving the plaintiff "the right to match another bid."  Defs.'

Reply at 9.  But for the use of the modified bidding process, the sale of the Property would have

been more competitive, the plaintiff may have had to pay more for the Property, and the

government "may have received greater compensation for the land."  *Id.*

The plaintiff offers four additional arguments to support its view that the challenged

decision is arbitrary and capricious:  (1) the agency failed to consider the Nevada state court's

dismissal, without prejudice, of all fraud claims against the plaintiff, Pl.'s Mem. at 20; (2) the

agency did not address how this sale falls within the three limited bases for withdrawing a sale

under 43 C.F.R. § 2711.3-1(f), *id.* at 22; (3) plaintiff's cancellation of the MPA with the City of

Henderson does not justify termination, *id.* at 25; and (4) the agency's termination decision based

on the lack of a development agreement is an improper policy shift, *id.* at 27.  None of these

arguments has merit but instead reflects the plaintiff's fundamental misunderstanding of the

agency's reason for terminating the sale.

First, dismissal of the City's fraud claims would only be relevant to the challenged

decision if the agency's decision to terminate the sale were due to the City's allegations of

fraudulent misrepresentations by the plaintiff.  While the agency was clearly aware of the City's

lawsuit, this suit was not the reason for the termination.  Instead, the agency focused on whether 43 C.F.R. § 2711.3-2, which repeats the statutory language from 43 U.S.C. § 1713(f), would be met if the premise for a modified competitive bidding process, namely, the MPA and the public benefits accruing from the development anticipated in that agreement, "no longer exists."  AR 7 (Recommendation Mem.).  Since the decision to terminate the sale was not premised upon the City's lawsuit, the dismissal of any claims asserted in that suit is simply irrelevant.  Consequently, the agency action was not arbitrary for failure to consider the dismissal of the fraud claims against the plaintiff in the City's lawsuit.

Second, the plaintiff argues that the challenged decision is governed by 43 C.F.R. § 2711.3-1(f), which sets out only three bases for the agency to "refuse or accept any offer or [] withdraw any tract for sale," but the challenged decision terminating the sale failed to cite to any of these three grounds.  Pl.'s Mem. at 22.  Under this regulation, agency officials are permitted to stop the sale upon determining that: "(1) Consummation of the sale would be inconsistent with the provisions of any existing law; or (2) Collusive or other activities have hindered or restrained free and open bidding; or (3) Consummation of the sale would encourage or promote speculation in public lands."  43 C.F.R. § 2711.3-1(f).  Even assuming that this regulation applies here, the plaintiff, again, is incorrect. [17]  As noted *supra*, BLM's recommendation to terminate the sale explained that "consummation of the sale would be inconsistent with the provisions of any existing law," because a modified competitive bidding process is no longer permissible under the circumstances.  AR 7 (Recommendation Mem., citing 43 C.F.R. 2711.3-2, and finding that

---

[17] This regulation applies "[w]hen public lands are offered through competitive bidding," 43 C.F.R. § 2611.3-1(f), as well as when public lands are "offered for sale utilizing modified competitive bidding procedures," *id.* at § 2611.3-2(a) & (e).  Nevertheless, the plaintiff's reliance on 43 C.F.R.  § 2611.3-1(f) is misplaced since this regulation provides the reasons for stopping a sale "prior to the expiration" of the thirty-day period within which the agency must act to accept or reject such offer. As discussed, *supra* in Part III.A.2, since the Secretary actually accepted the plaintiff's offer within the requisite time period, this regulation is inapplicable.

"relationship Henderson had with [the plaintiff] (and its founder []) as its preferred developer, for the arena facilities that Henderson identified as providing the public benefits it wished to promote through BLM's use of a modified competitive sale process, no longer exists as evidenced by the Settlement Agreement").  The fact that BLM would not have approved use of a modified competitive bidding process "but for the now-terminated Development Agreement and . . . representations about that Agreement and their relationship[,]" provides a substantial basis for the agency's finding that consummation of the sale predicated on an inappropriate process would be inconsistent with 43 U.S.C. § 1713(f) and the relevant regulations.  *Id.* [18]

Nevertheless, the plaintiff insists that all the factors contributing to BLM's approved use of a modified competitive bidding process still exist, including appropriate zoning for development of the Property, the plaintiff's "commitment to Henderson to continue the [P]roject" to develop an arena complex, and the City's desire to sell to the plaintiff.  Pl.'s Reply at 16.  Again, this argument reflects a misapprehension of the agency's reason for approval of the modified competitive bidding process naming the plaintiff as designated bidder.  Although the

---

[18]     The plaintiff expresses skepticism whether the agency, in fact, terminated the sale because consummation would be inconsistent with 43 C.F.R. § 2711.3-2(a) and 43 U.S.C. § 1713(f), citing the agency's use of the term "public interest" in briefing rather than the term "public benefit," which is used in the Recommendation Mem.  Pl.'s Reply at 12.  Due to the agency's word choice, the plaintiff contends that the agency's purported basis for termination—that the sale no longer is in the public interest—is "nothing more than an irrelevant *post hoc* justification."  *Id.*  As further evidence of the significance of this word choice, the plaintiff argues that the agency could not have relied upon the statutory requirement under 43 C.F.R. § 2711.3-2(a) and 43 U.S.C. § 1713(f), which allows modified competitive bidding only when it is "necessary . . . to recognize equitable considerations or public policies," because the phrase "public policies" is not the justification given in either the agency's briefs or the Recommendation Mem.  *Id.* at 13.  This myopic focus on word choice fails to identify any material semantic distinction in the words used by the agency and misses the big picture.  The agency's decision is not rendered arbitrary simply because the Recommendation Mem. used the phrase "public benefit," AR 7, rather than the precise statutory phrase "public policies," when the City's expression of its "public policies" to "advance the City's planning objectives," AR 4, encompassed the public benefits from the MPA consistently cited by the agency during administrative consideration and this litigation.  Moreover, to the extent that the plaintiff seeks to have its own investment in the project considered among the "equitable considerations" for approval of a modified competitive bidding process, Pl.'s Reply at 13, this would be inconsistent with prior agency interpretation of this phrase to mean historical uses of the land, not whether a potential bidder invested resources preparing the bid.  *See Richard D. and Virginia Troon Alan and Judith A. Gallion*, 93 IBLA 256, 263 (1986); *Hazel Anna Smith et al.*, 82 IBLA 230, 234–35 (1984).

agency was required under the SNPLMA to "jointly identify land . . . for privatization," AR 16 (Letter, dated Sept. 7, 2011, from City's Mayor to BLM), this requirement is not dispositive of the type of sale procedure to be used.  Indeed, BLM rejected the City's original request for a direct sale conveying the Property to the plaintiff as not appropriate because the project did not meet the requirements necessary to permit such a procedure.  AR 19 (Letter, dated Oct. 4, 2011, from BLM to City's Mayor); *see also* 43 U.S.C. § 1713(f) (granting the Secretary, not local governments, the duty to determine when modified competitive bidding should be used).  Instead, the NORA explicitly explains that the plaintiff is the designated bidder because it has "developed an agreement that provides for long-term public benefits to the City and local residents."  AR 11 (77 Fed. Reg. 20413-16).  The modified procedure was used because an *agreement* was in place, with all the attendant benefits accruing to the City, and not just the plaintiff's nebulous "commitment" to develop the Project in some unspecified manner, as promised by the plaintiff's holding company in the same letter cancelling the MPA.  AR 29 (Letter, dated November 28, 2012, from LVNSC to City).

Furthermore, the plaintiff's highlighting of the City's "support" of continuing the sale to the plaintiff ignores a significant obstacle: namely, that the City's Settlement Agreement barred the plaintiff's CEO, as well as any entities he owns or controls, from conducting business within the City.  AR 200 (Settlement Agreement) ("Milam represents and warrants, unconditionally and irrevocably, that neither he nor any entity which he owns (partially or fully), controls (partially or fully), or has an interest in, will seek to or engage in any business activities or development activities within Henderson, Nevada, including, but not limited to, any business activities or development relating to the land; excepting that Milam may, at the direction of the Lender

Parties, take any actions necessary to effect the purchase, financing, and ultimate sale of any part, or all, of the Land.").

Third, the plaintiff contends that the agency's decision to terminate the sale after cancellation of the MPA was arbitrary because the MPA expressly allowed for cancellation by either party and, if the plaintiff had not been the highest bidder, another party would have been permitted to purchase the Property without a pre-negotiated development agreement in place. This argument ignores the real-world context in which the modified bidding process operated: as the designated bidder, the plaintiff received preferential treatment in setting the terms of its bid and discouraging other potentially interested parties in participating. This preferential treatment was predicated on the extant MPA and the anticipated "public benefits" to the City. Whether another party without an existing development agreement could have become the highest bidder is both speculative and irrelevant. Similarly, the inclusion in the MPA of terms allowing cancellation by either party prior to closing, does not alter the specific factual context in which the agency approved the modified bidding process: the MPA was in place and the City relayed the expectation that, in accordance with the MPA, "LVNSC, working with Henderson and the State of Nevada, *will be* financing and constructing four sports venues . . . . This project . . . *will* result in the creation of approximately 10,000 immediate construction jobs on site, and permanent service and management jobs that will provide employment for an estimated 4,000 employees." AR 15 (Letter, dated Sept. 7, 2011, from City's Mayor to BLM).

Fourth, and relatedly, the plaintiff argues that it is an improper policy shift for the agency to require a development agreement before delivering land patents to successful bidders where it has not so required in the past. Pl.'s Mem. at 27. Contrary to the plaintiff's version of events, the agency did not terminate the sale solely because of cancellation of the MPA; it terminated the

sale because "the public benefits [the City] wished to promote through BLM's use of a modified competitive sale process [] no longer exist." AR 7 (Recommendation Mem.). Therefore, the termination of the sale reflects no "policy" shift, but rather the agency's compliance with the laws governing disposition of public lands.

In sum, the plaintiff's vigorous efforts to find fault with the agency's decision are not persuasive. On the contrary, the Court finds that the challenged decision is both rational and fully supported by substantial evidence.

## C.   THE AGENCY DID NOT VIOLATE PLAINTIFF'S DUE PROCESS RIGHT

The plaintiff faults not only the merits of the agency's decision terminating the land sale, but also the agency's decision-making process because the agency "never provided SSL notice and the opportunity to be heard before withdrawing the land sale and terminating the vested rights that SSL had to the property pursuant to 43 C.F.R. § 2711.3-1(g)." Pl.'s Mem. at 30. In the plaintiff's view, this failure to afford the plaintiff such an opportunity makes the challenged action "particularly arbitrary and capricious," *id.* at 29, and amounts to a denial of the plaintiff's due process rights.[19] The Court disagrees.

The Fifth Amendment's Due Process Clause requires that the government provide sufficient procedural protections whenever it deprives an individual of property. *See Bd. of Regents v. Roth*, 408 U.S. 564, 576 (1972). In evaluating due process claims, such as the plaintiff's here, the court "first ask[s] whether there exists a . . . property interest of which a

---

[19] The parties dispute whether the plaintiff's due process argument was properly pleaded. *See* Defs.' Mem. at 20; Pl.'s Reply at 25–27. The complaint does not contain any claim asserting a violation of plaintiff's due process rights as a basis for holding the challenged action violative of the APA, prompting the plaintiff to seek constructive amendment of the complaint. Pl.'s Reply at 27 (arguing that "constructively amending the Complaint through summary judgment will in no way prejudice defendants…."). The Court not need reach this issue since this due process argument is rejected on other grounds.

person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (citing *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. "In due process cases that arise out of contracts with the government, courts require that a claimant show a 'legitimate claim of entitlement' to some benefit that is protected by independent state-law rules, relevant contractual language and applicable federal regulations." *Toxco, Inc. v. Chu*, 801 F. Supp. 2d 1, 9 (D.D.C. 2011) (citations omitted).

In this case, the plaintiff's due process argument falls short of meeting the threshold requirement of showing a protectable property interest. *See Roth*, 408 U.S. at 569 ("The requirements of procedural due process apply only to the deprivation of interests encompassed by the [Fifth Amendment's] protection of liberty and property."); *Hettinga v. United States*, 677 F.3d 471, 479–80 (D.C. Cir. 2012) (per curiam) (noting threshold requirement "that the government has interfered with a cognizable liberty or property interest"). The plaintiff's procedural due process argument is based on the plaintiff's purported "administrative right to receive the patent," Pl.'s Mem. at 29, pursuant to 43 C.F.R. § 2711.3-1(g), which provides that "[u]ntil the acceptance of the offer and payment of the purchase price, the bidder has no contractual or other rights against the United States, and no action taken shall create any contractual or other obligation of the United States." According to the plaintiff, by delivering

final payment for the Property into escrow, the plaintiff triggered an entitlement to receive the patent. *Id.*

Contrary to the plaintiff's interpretation of this regulation, however, § 2711.3-1(g) merely clarifies when bidders have no rights against the United States, rather than affirmatively stating when bidders possess any rights, let alone the specific right to compel the agency to issue a land patent. *See supra* at n.14. Moreover, as discussed *supra* Part III.A, the agency is *not* obligated to deliver the patent to the plaintiff when consummation of the sale would be contrary to law. Consequently, the plaintiff has no "legitimate claim of entitlement" to which it was deprived without notice or an opportunity to be heard. *Roth*, 408 U.S. at 577

The cases relied upon by the plaintiff to support its due process argument are easily distinguishable. Pl.'s Mem. at 29–30. In *Fuentes v. Shevin*, 407 U.S. 67, 80–81 (1972), the Court focused on the fact that the goods at issue were taken from the plaintiff's *possession* pursuant to a challenged state statute, which was held to be unconstitutional for lack of pre-deprivation process. In *Roth*, the Court distinguishes between "college professors and staff members dismissed *during* the terms of their contracts," 408 U.S. at 576–77 (emphasis added), and the plaintiff in that case, whose employment contract with the government ended "with no provision for renewal whatsoever," *id.* at 578, concluding that while the former "have interests in continued employment that are safeguarded by due process," *id.* at 577, the latter did not, *id.* at 578. Finally, as support for the claim that "the government cannot arbitrarily strike down a land claim without due process," Pl.'s Reply at 28, the plaintiff relies on *Cameron*, where the Supreme Court stated that "the land department has no power to strike down any claim arbitrarily, but so long as the legal title remains in the Government it does have power, *after proper notice and upon adequate hearing*, to determine whether the claim is valid, and, if it be

found invalid, to declare it null and void." 252 U.S. at 460 (emphasis supplied). The claimant in *Cameron*, however, had occupied and used the land at issue for business purposes for many years. *Id*. at 459. In all three of these cases, whether the claimant was required to be accorded due process before the government removed a specific benefit or physical property depended on whether the benefit or property was already in the plaintiff's possession. By contrast, here, the plaintiff never possessed the Property, and to the extent that the plaintiff's expectation to receive a patent for the Property is based on the outcome of the modified bidding process, the plaintiff's own action in cancelling the MPA extinguished the lawful predicate for that process. Thus, any such expectation is no longer supported by applicable law or regulation.

Accordingly, the Court finds no due process violation.

## IV.   CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment is denied and the defendants' cross-motion for summary judgment is granted.

An Order consistent with this Memorandum Opinion will be contemporaneously entered.


Date: November 19, 2015


_____
BERYL A. HOWELL
United States District Judge